# OPINIONS OF THE JUSTICES.

## Opinion of the Justices to the Senate.

*Constitutional Law,* Initiative, General Court, Opinions of the Justices, Equal protection of laws, Separation of powers. *Initiative. School and School Committee,* Regional school district. *Supreme Judicial Court,* Opinions of the Justices.

A proposed Amendment to the Massachusetts Constitution was a "legislative amendment" requiring a majority favorable vote by the General Court in constitutional convention for it to be submitted to the people at the 1982 State election, rather than an amended "initiative amendment," requiring only a one-fourth favorable vote for it to be so submitted, where the proposed amendment, as altered by legislative action, varied greatly in form, structure, detail, and result from a proposal originally made by initiative, and took from the initiative amendment only a general intent to limit taxation. [1210-1212]

Where a proposed Amendment to the Massachusetts Constitution was the creation of the Legislature and had wholly replaced an Amendment originally proposed by initiative, the provision of art. 48 of the Amendments to the Massachusetts Constitution that certain matters shall not be the subject of an initiative petition had no application. [1213-1214]

A proposed Amendment to the Massachusetts Constitution containing tax limitation provisions which could be overriden by a "two-thirds vote of both branches of the general court with the approval of the governor," although inconsistent with certain provisions of the Massachusetts Constitution as they now exist, did not, on its face, violate any due process requirement of the Federal Constitution either by requiring a two-thirds vote or by affording the Governor an absolute veto of legislative action. [1214-1216]

Where a proposed Amendment to the Massachusetts Constitution would impose certain budgetary limitations on governmental units, and would require a four-fifths vote of a regional school district committee to override such budgetary limitations but would, in general, allow a school committee in a city or town to take such action by merely a two-thirds vote, the more stringent requirement applicable to regional school district committees bore a rational relationship to a legitimate State purpose, namely, furthering local control over taxes raised to support local government entities, and thus did not deprive students in regional school districts of their Federal constitutional right to the equal protection of the laws. [1216-1219]

The Justices requested to be excused from expressing their opinion in re-
sponse to a question asking them, in effect, to construe an existing stat-
ute in light of a proposed Amendment to the Massachusetts Constitu-
tion. [1219-1220]

Language in a proposed Amendment to the Massachusetts Constitution,
to the effect that certain tax limitation provisions could be overriden
by a two-thirds vote of an appropriating authority "or by any more
stringent requirement" that the appropriating authority might adopt,
did not, on its face, violate the equal protection clause of the Four-
teenth Amendment to the Federal Constitution. [1220-1222]

The Justices asked to be excused from answering questions whether cer-
tain language in a proposed Amendment to the Massachusetts Consti-
tution was vague or overly broad, where the questions, as propounded
to them by the Senate, gave no guidance regarding the provisions of
the Federal Constitution which any vagueness or overbreadth might
conceivably violate. [1222]


On June 11, 1982, the Justices submitted the following
answers to questions propounded to them by the Senate.

To the Honorable the Senate of the Commonwealth of
Massachusetts:

The Justices of the Supreme Judicial Court respectfully
submit their answers to the questions set forth in an order
adopted by the Senate on March 29, 1982, and transmitted
to this court on April 13, 1982, respecting a constitutional
amendment proposed by initiative petition and subsequent-
ly amended by the Legislature. The order is as follows:

"*Ordered, That*

"*Whereas,* Under the provisions of Article XLVIII of the
amendments to the constitution there was transmitted to
the general court by the state secretary on April 24th, 1980,
an initiative petition for an amendment to the constitution
for limiting taxes in the commonwealth, numbered House
No. 6252, a copy of which is attached hereto; and

"*Whereas,* Said initiative amendment was considered,
amended and received final legislative action for the first
time in the constitutional convention of the general court
under the provisions of sections 2 and 4 of The Initiative,
part 4, of said Article XLVIII on September 24th, 1980; and

"*Whereas,* Said initiative amendment was amended with a substantial new text a copy of which is attached hereto, which included twenty-one new sections replacing the original nine sections and, in accordance with the provisions of section 5 of The Initiative, part 4 of Article XLVIII, said initiative amendment, House No. 6252, as amended, a copy of which is attached hereto, may be considered in the 1982 constitutional convention of the general court; and

"*Whereas,* Grave doubt exists as to the procedure to be followed relative to House No. 6252, as amended, and as to the constitutionality of said initiative amendment; therefore be it

"*Ordered,* That the opinion of the honorable justices of the supreme judicial court be required by the senate upon the following important questions of law:

"1. Do the provisions of sections 3 and 20 of said House No. 6252, as amended, which establish certain excess taxes to be credited to a separate fund, involve the establishment of a 'specific appropriation' in violation of section 2 of Part II of The Initiative of said Article XLVIII?

"2. Does the requirement of 'a two-thirds vote of both branches of the general court together with the approval of the governor' in section 4 of House No. 6252, as amended, violate Article XXX of Part the First of the Declaration of Rights of the Constitution of the Commonwealth and the fourteenth amendment of the United States Constitution?

"3. Do the amendments to said House No. 6252 adopted on September 18th, 1980 and referred to the next general court require in the next constitutional convention the affirmative votes of not less than a majority of all members elected to the general court in order to submit said House No. 6252, as amended, to the people at the biennial state election in 1982?

"4. Does section 9, which establishes requirements for increasing the budget limit for public schools in a regional school district which are different from the requirements applicable to a city or town deny equal protection of the law to the students of certain public schools in the commonwealth

under the provisions of the fourteenth amendment of the United States constitution?

"5. Would the adoption of said House No. 6252, as amended, render the tax limitation provisions established by chapter 580 of the Acts of 1980 constitutionally incompetent?

"6. Is the phrase 'by any more stringent requirement' as used in sections 4, 8, 9, 10, 11, 12, 13, 14 and 15 of said House No. 6252, as amended, so vague, uncertain and indefinite so as to render said sections constitutionally incompetent and to deny the citizens of the commonwealth equal protection of the law under the provisions of the fourteenth Amendment of the United States constitution?

"7. Is the definition 'seventeen most similar states' in section 2 of said House No. 6252, as amended, so vague, uncertain and indefinite that such definition renders section 18 constitutionally incompetent?"

On December 5, 1979, the Secretary of the Commonwealth received an initiative petition, accompanied by the required number of signatures of qualified voters, for an Amendment to the Constitution of the Commonwealth limiting State and local taxes in the Commonwealth (initiative amendment). In accordance with art. 48 of the Amendments to the Constitution of the Commonwealth, the Secretary transmitted this measure to the Clerk of the House of Representatives on April 24, 1980. The initiative amendment, numbered House No. 6252, was sent to a joint committee on taxation, and reported out with an unfavorable recommendation. 1980 Sen. Doc. No. 2170. House No. 6252 subsequently was considered by the 1980 Constitutional Convention, a joint session of the Senate and House of Representatives called to consider pending constitutional amendments. On September 24, 1980, the convention adopted, by a vote of 172 to 9, an amendment to House No. 6252 proposed by Representative Gerald M. Cohen. The Cohen amendment struck out the original nine sections of the initiative amendment and replaced them with twenty-one sections differing substantially from the original in form and effect. The order recites that the Cohen amendment,

House No. 6252, as amended, may be considered again by the 1982 Constitutional Convention.

The Senate, by order transmitted to us on April 13, 1982, asked our opinion regarding seven questions relating to the Cohen amendment. This court issued an announcement that briefs concerning the issues raised by the seven questions would be received up to and including May 5, 1982. Nine parties submitted briefs,[1] some of which addressed only one of the questions asked.

_The Cohen amendment._ The Cohen amendment would create a revenue limitation board (board), composed of seven members: the Secretary of Administration of the Commonwealth, the chairmen of the House and Senate committees responsible for reviewing taxation matters, and four members of the public to be appointed by the Governor. § 19. At least two of these appointees are to be experienced in the field of economics and, of the remaining two, one is to be experienced in the field of business management and the other, a member of a recognized labor union. The board is to be responsible for calculating and determining all statistics and other matters necessary to carry out the intent of the Cohen amendment. That intent is, according to § 1, to reduce "the percent of personal income taken for state and local revenues . . . to a level that is more competitive with other industrial states." The board's calculations and determinations are to be based upon statistics determined or estimated by the United States Department of Commerce or a successor Federal agency. The board is empowered, however, to "adjust any such statistics or estimates to carry out the intent" of the amendment. § 19.

---

[1] Those amici who submitted briefs were: Associated Industries of Massachusetts, the Attorney General of the Commonwealth, Citizens for Limited Taxation, Massachusetts Campaign against Restoration of the Death Penalty (and the Honorable Jack H. Backman), Massachusetts Municipal Association, Massachusetts Tax Reform Association, Massachusetts Teachers Association, Mr. Robert J. McGee, and a group consisting of Massachusetts Human Services Coalition, Inc., National Association of Social Workers, Massachusetts Council of Human Services Providers, American Federation of State, County and Municipal Employees, Local 93, and Coalition for Basic Human Needs.

The board's primary duty is to calculate annually the tax limitation percentage (defined in § 2) applicable to the next year's State and local tax revenue raising efforts. In order to calculate this percentage, the board first must make several other determinations:

(1) The board must select the "[s]eventeen most similar states," i.e., those with which the Commonwealth "is most competitive in attracting and retaining business and jobs." *Id.*

(2) It must ascertain the "[t]otal state personal income," defined in § 2 as "the total personal income of all residents," for Massachusetts and for each of the seventeen most similar States. *Id.* § 18.

(3) It must ascertain the "[t]otal state and local revenues" (as defined in § 2) for Massachusetts and for each of the seventeen most similar States. § 18. "Total state and local revenues" include the total amount of taxes, charges and miscellaneous general revenues collected from all State, city, town, district, and regional governmental sources; it excludes, among other things, any amount permitted (by sections of the amendment discussed below) to be raised in excess of the tax limits created by the amendment.

(4) The board must calculate the "[t]ax burden" (defined in § 2) for Massachusetts and for the seventeen most similar States by determining the percentage of "total state personal income" which is accounted for by "total state and local revenues." See § 18.

With these figures, which must be determined for the current fiscal year and for the two fiscal years preceding it (for Massachusetts and for each of the seventeen most similar States), the board must calculate the tax limitation percentage applicable to the next fiscal year. Initially, this percentage is 100 % : State and local revenue raising authorities are authorized to collect at least the same amount during the next fiscal year as they did during the current fiscal year. In addition, if total State personal income (as determined by the board) has increased between the last and current fiscal years, the tax limitation percentage increases

proportionally: State and local tax revenues may rise to keep pace with the growth in total State personal income.

If, however, the average tax burden in Massachusetts for the three most recent years has exceeded the average tax burden in the seventeen most similar States for the comparable period, the board must reduce the otherwise allowable tax limitation percentage by the lesser of (1) one half of one percent, or (2) the amount by which the average tax burden in Massachusetts for the three-year period exceeded the average tax burden in the seventeen most similar States for that period. § 18. The tax limitation percentage cannot be reduced, in any event, below 100%. § 2. The Cohen amendment thus does not require a reduction in total State and local tax revenues from one year to the next; it limits, rather, the rate at which these revenues may be increased.

The board is to report to the General Court, no later than March 1 each year, the tax limitation percentage applicable to the next year's revenue raising efforts. § 19. The General Court is to designate a State agency to calculate the amounts which each governmental entity (other than the State) may levy, budget, or appropriate, and to certify to these entities the appropriate amounts. § 16.

The Cohen amendment categorizes governmental entities as (a) the State; (b) appropriating authorities, i.e., cities and towns as well as those districts which possess the power (as do cities and towns) to levy directly a tax on property, see § 2; (c) regional governmental units, defined as counties and districts which do not levy directly property taxes, the budgets of which are financed in whole or in part by sums raised in the property tax levy of any one or more cities or towns, id.; and (d) school committees of cities and towns. The class of "regional governmental units" is further divided into (1) units which submit their budgets to one or more local appropriating authorities, and (2) units which do not submit their budgets to local appropriating authorities, i.e., counties. §§ 9, 12. Regional school districts, which otherwise would fall into the class of regional governmental units which submit their budgets to local appropriating authorities, are singled out for special treatment. § 10.

These categories are important primarily in that they affect the manner in which governmental entities can override the tax limits created by the Cohen amendment. The State government may override the tax limit set by the board, but only by means of a measure specifying the amount to be raised which is approved by a two-thirds vote of each branch of the General Court and by the Governor, "or by any more stringent [approval] requirement which may be adopted by the general court." § 4. Similarly, local appropriating authorities may override the tax limits certified to them by a two-thirds vote of their governing bodies, "or by any more stringent requirement that may be adopted." § 13. A regional governmental unit which submits a budget to more than one local appropriating authority (other than a transportation authority or regional school district) must submit a request for a tax limit override; the request must be approved by a two-thirds vote of the unit's governing body. § 9. In order to obtain the funding sought, such regional governmental units must obtain also the approval of its request by two-thirds of the local appropriating authorities involved, and each authority which approves the request must do so by a two-thirds vote or "any more stringent" requirement. *Id.* Regional school districts seeking funds in excess of the amounts to which they are limited by the Cohen amendment, however, must submit budgets to their local appropriating authorities which have been approved by a four-fifths vote of their regional school district committees or by any "more stringent" requirement. § 10.

Regional governmental units that do not submit their budgets to local appropriating authorities (i.e., counties) may submit requests for budgets in excess of the limits certified to them only with the approval of two-thirds of their governing bodies; such requests must be approved by a majority of each branch of the General Court and by the Governor, or by any "more stringent" requirement. § 12. Regional transit authorities may increase their budgets over the amounts certified to them by a two-thirds vote of their governing bodies (or "any more stringent" requirement),

and a two-thirds vote of their advisory boards, if any (or "any more stringent" requirement). § 11.

If the State government collects taxes in excess of those allowable according to the tax limitation percentage set by the revenue board, the excess is to be deposited in a special fund, segregated and managed separately from other State funds, to be created pursuant to section 20 of the Cohen amendment. The section 20 fund may be used for any proper public purpose, but only if appropriations from the fund are approved by a two-thirds vote of each branch of the General Court and by the Governor. Local appropriating authorities (which have the power to levy directly a property tax) are to apply any "free cash" remaining at the end of a fiscal year to reduce the next year's property tax levy unless these authorities approve, by a two-thirds vote (or any "more stringent" requirement) the retention of this cash for other purposes. § 15.

The Cohen amendment differs markedly from the initiative amendment received by the General Court. Without going into detail, we note some of the major differences.

(1) The initiative amendment would have given constitutional stature to a 2 ½ % property tax limitation similar to that embodied in St. 1980, c. 580, a statute enacted through the initiative process and commonly referred to as "Proposition 2 ½"; the Cohen amendment contains no such limitation.

(2) The stated intent of the initiative amendment was to maintain "a reasonable relationship . . . between the taxes imposed by the Commonwealth and its political subdivisions and the income of its people, between taxes on property and its value, and between the taxes imposed by the Commonwealth and its political subdivisions and the taxes imposed by other states." To further this intent, the initiative amendment contrasted the revenues collected by the Commonwealth's State and local governments, and the total personal income of residents of the Commonwealth, with the national averages of total State and local revenues and total personal income per State. The Cohen amendment's declared intent is to reduce "the percent of personal

income taken for state and local revenues . . . to a level that is more competitive with other industrial states." § 1. To achieve this stated goal, the Cohen amendment compares the total Massachusetts personal income and total Massachusetts tax burden with those of the "seventeen most similar states," i.e., those "with which the commonwealth is most competitive in attracting and retaining business and jobs." § 2.

(3) The initiative amendment set up a Special Reserve Fund for emergency needs, subject to legislative appropriation and with no absolute veto power in the Governor (although the Governor's declaration of an emergency was a condition precedent to any appropriation from the fund); the Cohen amendment's "special fund" is not reserved for emergencies, and appropriations from the fund are subject to the Governor's absolute veto.

(4) The initiative amendment would have created an Economic Estimates Board, which differs greatly in purpose, power, and membership from the Cohen amendment's revenue limitation board.

(5) The initiative amendment created a taxpayer's right of action to enforce that amendment; the Cohen amendment would create no such right of action.

In short, all that the Cohen Amendment took from the initiative amendment which it replaced was a general intent to limit taxation; in form, structure, detail, and result the Cohen amendment and the initiative amendment are widely divergent.

*The Questions.* We address first question 3, as our answer to that question affects our resolution of question 1.

*Question three.* Question 3 asks our opinion whether the Cohen amendment must be approved, in the next constitutional convention, by the affirmative votes of not less than a majority of all the members elected to the General Court in order for it to be submitted to the people at the 1982 State elections. We assume that the General Court, acting pursuant to art. 48, The Initiative, IV, § 3, properly "amended" the initiative amendment by substituting the

Cohen amendment for that measure.[2]  As will be shown, we must determine whether the Cohen amendment is a "legislative amendment" or an amended "initiative amendment." Upon this decision depends the number of affirmative votes of the members elected to the General Court that is required to place the Cohen amendment on the ballot.

While question 3 asks merely whether a greater than majority vote is sufficient, we construe the question as inquiring by implication whether a one-fourth approving vote would be sufficient.  The Legislature has a duty to act on the Cohen amendment at the next joint constitutional session, and if the vote to approve that measure is greater than one-fourth but less than a majority, a decision whether that vote is sufficient will be required.  To avoid the uncertainty that would exist in such a situation, we consider this issue here.

Article 48, The Initiative, IV, § 1, defines "initiative amendment" as "[a] proposal for amendment to the constitution introduced into the general court by initiative petition"; "legislative amendment" is defined as "an amendment [to the Constitution] introduced by a member of either house."  A legislative amendment appears on the ballot if it receives no less than a majority vote of all the members elected to the General Court into which the measure was introduced, and receives no less than a majority vote of all the members elected to the succeeding General Court. Art. 48, The Initiative, IV, §§ 4, 5.  An initiative amendment which is not amended, pursuant to Art. 48, The Initiative, IV, § 3, by the General Court into which it is introduced, appears on the ballot if it receives the votes of no less than one fourth of the votes of all the members elected to two successive General Courts.  Art. 48, The Initiative, IV, §§ 4, 5.  In each case, the General Court must act on the measures in two consecutive joint sessions.  The treatment

---

[2] Three of the amici assert that we should answer question 3 in the negative, arguing that the Legislature's power to amend initiative amendments does not encompass the substitution, under the guise of an amendment, of a completely new measure.  We do not consider this issue, however, as it is not properly before us.

of constitutional amendments proposed by initiative, and subsequently amended (as was House No. 6252) pursuant to § 3 of art. 48, IV, is not made explicit. We conclude, however, that the Cohen amendment, is a "legislative amendment" which requires at least a majority vote of the members of the General Court in order to appear on the ballot.

The "one-fourth vote" requirement applicable to initiative amendments was intended as a "legislative minority check" on initiative amendments to the Constitution. Its purpose is to ensure that initiative amendments submitted to the people for approval have at least a reasonable amount of public support, as reflected by the favorable votes of at least one fourth of the legislators elected to the General Court. See 2 Debates in the Massachusetts Constitutional Convention, 1917-1918, at 680, 688 (1918) (hereinafter Debates); Stewart, The Law of Initiative Referendum in Massachusetts, 12 New England L. Rev. 455, 487 (1977). The Cohen amendment is not the result of a "people's process" (*Buckley* v. *Secretary of the Commonwealth*, 371 Mass. 195, 199 [1976]), but is a measure created entirely by the Legislature. It would be inconsistent with the purpose for which the "legislative minority check" was adopted to allow the Cohen Amendment to be submitted to the people on a positive vote of only one fourth of the Legislature.

We answer question 3, "Yes."[3]

---

[3] We are urged by an amicus to refrain from answering any of the questions posed by the Senate because of the pendency of a lawsuit which conceivably could make unimportant the issues raised. S.J.C., Suffolk County, Doc. No. 80-354. The case involves the procedures by which the General Court was called back into session after prorogation in 1980 to consider the initiative amendment herein discussed, and other proposed constitutional amendments; the relief sought by the petitioner in that case is a declaration that the proposed constitutional amendments approved for the first time in the 1980 constitutional convention were not approved by a properly-constituted joint session and, since they cannot now be approved by two successive constitutional joint sessions including that into which they were introduced, those proposed amendments properly cannot come before the 1982 Constitutional Convention.

While the procedural errors alleged conceivably could make unnecessary any decision regarding the issues raised by the Senate's request for our

*Question one.* Question 1 inquires whether the special fund created by §§ 3 & 20 of the Cohen amendment constitutes a "specific appropriation" in violation of the "excluded matters" provision of art. 48. That provision reads, in pertinent part, as follows: "No measure that . . . makes a specific appropriation of money from the treasury of the commonwealth, shall be proposed *by an initiative petition* (emphasis supplied)." Art. 48, The Initiative, II, § 2. The term "measure" includes both statutes and constitutional amendments proposed by initiative.

Even assuming that the Cohen amendment creates a "specific appropriation" of funds from the State treasury,[4] the "excluded matters" provision of art. 48 has no application to that proposed amendment. The Cohen amendment was proposed, not by an initiative petition, but by a petition filed by a member of the General Court. The "excluded matters" provision of art. 48 limits only the subject matter of measures proposed by initiative petition; it does not limit the subject matter of measures proposed by legislators, whether by means of a "legislative amendment" or otherwise. With respect to the prohibition against "specific appropriation[s]," a legislative measure does not pose the problem which that prohibition was intended to solve. There is no "appropriation by the people of specific sums of money [which] would knock spots, if I may use a slang expression, out of any State budget, and prevent any real reg-

---

opinion (a question which, of course, we do not decide), it appears that the petitioner does not intend to press his suit, which is now in abeyance, unless the 1982 Constitutional Convention again approves certain of the proposed constitutional amendments which may be considered in that convention. The Senate has asked our advice regarding approval procedures. We believe it our duty to answer certain of the questions posed.

[4] The "appropriation," if any, does not appear to be "specific" in any event, since "[a]ll or any portion of the monies credited to the [special] fund from time to time may be appropriated by acts of the general court for the purpose or purposes established in such acts . . . ." House No. 6252, as amended, § 20. "Permanently to lay hold of and appropriate to a *single public use* all the revenue derived from one source of taxation we think is a 'specific appropriation' within that prohibition." (Emphasis supplied.) *Opinion of the Justices,* 297 Mass. 577, 581 (1937).

ulation and careful administration of the finances of the State." Debates, *supra* at 828-829. See *Slama* v. *Attorney Gen.*, 384 Mass. 620, 627 & n.7 (1981). Our conclusion that House No. 6252, as amended, is a "legislative amendment" requires that we answer question 1 in the negative.

We answer question 1, "No."

*Question two.* Question 2 inquires whether the requirement of a "two-thirds vote of both branches of the general court together with the approval of the governor" to override the tax limitations created by the Cohen amendment, which requirement is found in § 4 of that amendment,[5] violates either art. 30 of the Declaration of Rights of the Massachusetts Constitution or the Fourteenth Amendment to the United States Constitution. We find no violation of these constitutional provisions.

We cannot comprehend how a proposed amendment to the Massachusetts Constitution could be found to violate that Constitution. See *Answer of the Justices*, 375 Mass. 847, 849 n.2 (1978); *Cohen* v. *Attorney Gen.*, 354 Mass. 384, 389 (1968) ("an attempt to amend a constitutional provision is not open to objection because it is inconsistent with that provision"). While it must be conceded that allowing the Governor an absolute veto over any measure approved by the General Court is inconsistent with certain provisions of our Constitution as they now exist,[6] we are not persuaded that the Cohen amendment is constitutionally flawed because it does not amend those provisions explicitly. Any concern about possible confusion of the people which conceivably could result from the absence, in the text of the

---

[5] Although the Senate inquires only with respect to the requirement found in § 4 of the Cohen amendment, an identical requirement is also contained in §§ 12 and 20 of that measure.

[6] See *Opinion of the Justices*, 294 Mass. 616, 621 (1936) ("[a]n underlying feature of our form of government is that the power to raise money, levy taxes and control the expenditure of public funds is vested in the General Court. Constitution, Part the First, art. 23; Part the Second, c. 1, § 1, art. 4; § 3, art. 7").

Cohen amendment, of provisions specifically amending other sections of the Constitution, doubtless will be allayed by the efforts of advocates and opponents of the measure to publicize its possible effects if it should appear on the ballot.

The Senate has provided us with no indication regarding the manner in which § 4 of the Cohen amendment might violate the Fourteenth Amendment to the United States Constitution. If the Senate intended to inquire whether the "two-thirds vote" requirement violates the due process clause, the possibility of such a violation seems foreclosed by *Gordon* v. *Lance,* 403 U.S. 1 (1971), in which the United States Supreme Court found constitutional provisions of the West Virginia Constitution and statutes which required approval by sixty percent of the voters in a referendum election if bonded indebtedness and tax rate limits were to be increased beyond those specified in the State Constitution. We see no difference of constitutional significance between sixty percent and two-thirds approval requirements. On its face, the two-thirds vote requirement does not violate the due process clause.[7]

If the power conferred upon the Governor is the subject of the Senate's inquiry, we reach the same result. While the court has said that "[i]n this country the absolute veto is unknown; the qualified or limited veto is all an executive has . . ." *Mayor of Lowell* v. *Dadman,* 191 Mass. 370, 371 (1906), this statement simply describes a general state of affairs, and does not lay down a rule of constitutional law. "Whether the legislative, executive and judicial powers of a State shall be kept altogether distinct and separate, or whether persons or collections of persons belonging to one department may, in respect to some matters, exert powers which, strictly speaking, pertain to another department of

---

[7] In view of the Supreme Court's caveat that it "intimate[d] no view on the constitutionality of a provision requiring unanimity or giving a veto power to a very small group" (*Gordon* v. *Lance,* 403 U.S. 1, 8 n.6 [1971]), and because the question is not before us, we offer no opinion regarding the constitutionality of § 4 of House No. 6252, as amended, if the approval requirement is made "more stringent," as § 4 permits the General Court to do.

government, is for the determination of the State. And its determination one way or the other cannot be an element in the inquiry whether the due process of law prescribed by the Fourteenth Amendment has been respected by the State . . . ." *Dreyer* v. *Illinois,* 187 U.S. 71, 84 (1902). See *Sweezy* v. *New Hampshire,* 354 U.S. 234, 255 (1957) ("the concept of separation of powers embodied in the United States Constitution is not mandatory in state governments").

We answer question 2, "No."

*Question four.* Question 4 asks whether § 10 of the Cohen amendment,[8] which establishes requirements for increasing the budget limit for public schools in a regional school district that differ from those applicable to school districts in cities and towns, denies equal protection of the laws to students of certain public schools in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. Section 10 requires a four-fifths vote of a regional school district committee to increase the budget of that district over the budget limit certified to it; in general, the school committees of cities and towns may approve, by a two-thirds vote, budgets in excess of the limits certified to them. § 5. Both local school committees and the school committees of regional school districts must submit their budgets to one or more local appropriating authorities. Section 10 may be deficient in that it lacks any reference to local appropriating authorities. Cf. § 9 (regional transit authorities). Perhaps an "override" budget submitted by a regional school district could be approved by majority vote of a simple majority of the relevant local appropriating authorities; perhaps requirements similar to those imposed by § 9 were meant to apply.

The question asked relates to possible impairment of the rights of *students*; no impairment of voting rights is sug-

---

[8] The question refers to § 9 of the Cohen amendment. It is clear from the content of the question, however, that the Senate intended to refer to § 10.

gested. Based upon the reasoning of *San Antonio Independent School Dist.* v. *Rodriguez*, 411 U.S. 1, 35-37 (1973), equal access to educational opportunities is not a fundamental right under the United States Constitution. Nor does it appear likely that the United States Supreme Court would consider students attending either regional or local schools to be a suspect class. See *id.* at 28. Our inquiry is restricted, therefore, to whether a rational basis exists for the distinction made by the Cohen amendment between students in regional and local school districts. See *Massachusetts Pub. Interest Research Group* v. *Secretary of the Commonwealth*, 375 Mass. 85, 92-93 & n.3 (1978).

The equal protection clause of the Fourteenth Amendment of the United States Constitution "requires, at a minimum, that a . . . classification bear some rational relationship to a legitimate state purpose." *Trimble* v. *Gordon*, 430 U.S. 762, 766 (1977), quoting from *Weber* v. *Aetna Cas. & Sur. Co.*, 406 U.S. 164, 172 (1972). Since we are asked our opinion of a measure not yet approved by the people as an Amendment to our Constitution, we do not extend a presumption of validity to the measure (as we would with respect to an enacted statute or approved constitutional Amendment). See *Opinion of the Justices*, 345 Mass. 780, 781-782 (1963). "If there are reasons for a valid legislative distinctive treatment, they must be found in the origin, history, and characteristics," *id.* at 782, of regional school districts.

A recent Federal case, *Burton* v. *Whittier Regional Vocational Technical School Dist.*, 587 F.2d 66 (1st Cir. 1978), demonstrates that differing treatment of regional and local school districts with respect to tax limitation override requirements has a rational basis. General Laws c. 71, §§ 14 and 14A, govern the creation of regional school districts. These sections allow local communities, through their town meetings, to elect regional school district planning boards.[9]

---

[9] General Laws c. 71, §§ 14 and 14A, apply by their terms only to towns. The Legislature, of course, may extend by statute the benefits of

If these boards decide that establishment of a regional school district is warranted, they may make recommendations to their town meetings regarding "[t]he number, composition, method of selection, and terms of office" of the regional school district committee. G. L. c. 71, § 14B.

As *Burton* reveals, Haverhill accepted the recommendation of its school district planning board that it enter into an agreement creating the regional school committee, and providing that the members of that committee be appointed by the local school committees of the regional school district's constituent municipalities. The agreement also provided that Haverhill, through its school committee, should be allowed to appoint only 2 of 13 members to the regional school committee, although Haverhill's population comprised forty-one percent of that of the area served by the regional district. The United States Court of Appeals for the First Circuit upheld this arrangement against a challenge on equal protection and "one person — one vote" grounds. *Id.* at 69-70.

From the factual background of *Burton*, it appears that there exist in Massachusetts at least some regional school districts whose school committees are not made up of members elected or appointed by their constituent municipalities in proportion to the population of those municipalities. This creates the possibility that, in an extreme case, a member municipality whose population constitutes a majority of the population served by a regional school district, and which bears the brunt of the burden of financing the budget of that regional school district, may not be represented on the regional school district committee in proportion to its responsibility to finance that committee's budgets. Further, contractual obligations assumed by constituent municipalities as a result of bonded indebtedness incurred to construct regional school facilities must be met by those

---

those sections to cities as well. The regional school district which was the subject of *Burton* v. *Whittier Regional Vocational Technical School Dist.*, 587 F.2d 66 (1st Cir. 1978), included the cities of Haverhill and Newburyport; that district was created by St. 1969, c. 381, § 1.

municipalities regardless whether they are still members of the regional school district. *Id.* at 68. Hence, as a practical matter, it may be impossible for a municipality to withdraw from a regional school district and set up its own school system.

In cities and towns, local school committee members are elected by qualified voters in the municipalities whose schools they manage. G. L. c. 41, § 1; c. 43, § 31. Those who elect school committee members are largely responsible for financing, through taxes, the budgets submitted by those members. In contrast, regional school committee members may be empowered, in some instances, to approve budgets for which the people who elected or appointed them are not obligated in proportion to their representation on the regional school committee. The Legislature rationally could have based its differing treatment of regional and local school districts on the legitimate objective of furthering local control over taxes raised to support local government entities. These differences in treatment do not violate the students' right to equal protection of the laws.

We answer question 4, "No."

*Question five.* Question 5 asks whether adoption of the Cohen amendment would render the tax limitation provisions of St. 1980, c. 580 (Proposition 2½) "constitutionally incompetent."

The right of this court to render advisory opinions, under the Massachusetts Constitution, Part II, c. 3, art. 2, as amended by art. 85 of the Amendments, is limited by the separation of powers doctrine embodied in art. 30 of the Declaration of Rights. The purpose behind the constitutional provision regarding advisory opinions "is to enable the Justices to give such advice to the Legislature, the Governor, and the [Governor's] Council as would be necessary to enable these departments to perform their duties in a manner consistent with our Constitution." *Answer of the Justices,* 373 Mass. 898, 901 (1977). When this purpose would not be served, we have asked to be ex-

cused from answering questions posed to us. See *id.*; *Answer of the Justices,* 375 Mass. 790, 793 (1978).

With respect to question 5, there is no duty imminently confronting the Senate: our answer will not provide the guidance necessary to ensure that the Senate acts in a manner consistent with our Constitution. As a result, there is no "solemn occasion" within the meaning of the Constitution. The Senate has asked us, in effect, to construe an existing statute in light of the Cohen amendment. It is not within our power to do so. See *id.*; *Answer of the Justices,* 150 Mass. 598 (1890); *Answer of the Justices,* 148 Mass. 623 (1889).

We respectfully request to be excused from answering question 5.

*Question six.* Question 6 asks whether the phrase "or by any more stringent requirement," which appears in a number of sections of the Cohen amendment and relates, in most of those sections, to approval requirements for overriding the tax limits created by that bill, is "so vague, uncertain and indefinite so as to render said sections constitutionally incompetent" and to deny Massachusetts citizens the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution.

As to the equal protection issue, the phrase "or by any more stringent requirement," on its face, does not render the sections of the Cohen amendment which contain that phrase violative of the equal protection clause of the Fourteenth Amendment. We do not offer an opinion regarding whether the phrase, as applied, would impair the rights guaranteed by that amendment. That question is not before us.[10]

---

[10] The United States Supreme Court, in upholding a requirement that incurrence of bonded indebtedness in excess of the limits set by the Virginia Constitution be approved by no less than sixty percent of those citizens voting on the issue, reserved judgment regarding whether a provision "requiring unanimity or giving a veto power to a very small group" would violate the United States Constitution. *Gordon* v. *Lance,* 403 U.S. 1, 8 n.6 (1971). Given the context in which this issue arises, we must also reserve judgment.

Questions of vagueness and overbreadth usually do not arise in connection with constitutional amendments, since constitutional provisions "commonly [are] to be interpreted as stating a broad and general principle of government, regulative of all conditions arising in the future and falling within [their] terms." *Opinion of the Justices,* 261 Mass. 523, 543-544 (1927). Accord, *Opinion of the Justices,* 308 Mass. 601, 613 (1941). Further, "[t]he vice of vagueness in the due process sense is generally said to be 'the risk of unfair prosecution and the potential deterrence of constitutionally protected conduct.'" *Opinion of the Justices,* 368 Mass. 849, 851 (1975), quoting from *Cramp* v. *Board of Pub. Instruction of Orange County,* 368 U.S. 278, 283 (1961). Amici have not suggested any manner in which inclusion of this phrase might increase these risks, and we decline to speculate with regard to this issue.

The words of Part II, c. 3, art. 2, of the Constitution, as amended by art. 85 of the Amendments, "are clear to the effect that 'opinions of the justices' may be required 'upon important questions of law.' Those words mean that the important questions of law must be explicitly stated: they cannot be left to equivocal implications. An opinion upon a question of constitutional law cannot be so framed as to be helpful to legislators without a definite statement of the point of difficulty which has been developed through hearings and discussion." *Answer of the Justices,* 299 Mass. 617, 620 (1938). We have no guidance regarding those provisions of the United States Constitution which the possible vagueness of the phrase, "or by any more stringent requirement," might conceivably violate. Absent such guidance, we are left with a request "to examine a long and complicated [measure] . . . to ascertain whether we can discover questions to be raised as to [its] validity." *Opinion of the Justices,* 239 Mass. 606, 612 (1921). "The practice always has been for the Justices to confine their answers to the particular questions of law submitted to them." *Id.* Accord, *Opinion of the Justices,* 333 Mass. 773, 782 (1955). Since we cannot ascertain any "important question of law" in that

portion of question 6 involving possible vagueness and indefiniteness, we are unable to answer that portion of the question. See *Opinion of the Justices*, 368 Mass. at 852.

We answer that portion of question 6 involving equal protection, "No." We respectfully request to be excused from answering the remainder of the question.

*Question seven.* Question 7 involves the possible "constitutional incompeten[ce]" of the Cohen amendment because of the vagueness and indefiniteness of the phrase "seventeen most similar states" which appears in §§ 2 & 18 of that measure. No suggestion is offered regarding any constitutional provision which the Senate thought might be violated by the use of that phrase.

For the reasons given above, we respectfully request to be excused from answering question 7.

In summary, we answer questions 1, 2 and 4, "No," we answer question 3, "Yes," and we request to be excused from answering questions 5 and 7. With respect to question 6, we answer the equal protection portion of that question, subject to the limitation discussed above, "No," and request to be excused from answering the remainder of that question.

The foregoing answers and opinions are submitted by the Chief Justice and the Associate Justices subscribing hereto on the eighth day of June, 1982.

> EDWARD F. HENNESSEY
> HERBERT P. WILKINS
> PAUL J. LIACOS
> RUTH I. ABRAMS
> JOSEPH R. NOLAN
> NEIL L. LYNCH
> FRANCIS P. O'CONNOR